Filed 4/29/26  Kim v. Pets' Rx CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| JEAN KIM,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>PETS' RX, INC., et al.,<br><br>    Defendants and Respondents. | H052605<br>(Santa Clara County<br>Super. Ct. No. 19CV356353) |

Plaintiff Jean Kim, a self-represented litigant, appeals after summary judgment was granted in favor of defendant Pets' Rx, Inc., doing business as VCA Vets & Pets Animal Hospital (VCA), and defendant Tiffany Sung, a veterinarian.  Kim alleged that defendants failed to properly handle Kim's cat during a veterinarian's appointment and that the cat suffered a broken leg as a result.  The cat died approximately two months later.  Kim alleged causes of action for veterinary malpractice, gross negligence, and violation of the unfair competition law (UCL) (Bus. & Prof. Code, § 17200 et seq.).

In moving for summary judgment, defendants relied on, among other evidence, a necropsy report indicating that the cat died of cancer, and an expert declaration opining that the femoral fracture likely predated Dr. Sung's treatment of the cat and Dr. Sung acted within the standard of care.  In opposition, Kim did not provide an expert declaration contradicting the defense expert.  After granting summary judgment, the court also denied Kim's motion for new trial.

On appeal, Kim contends that the trial court erred in granting summary judgment and in denying her motion for new trial. For reasons that we will explain, we will affirm the judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. *Kim's Cat*

Kim had a female, domestic, short-haired cat. The cat was more than eight years old.

#### 1. Examination by a San Jose animal hospital

In early October 2018, Kim took the cat to a San Jose animal hospital for urinary-related problems. The cat was "very fractious and angry." An examination was done after the cat was sedated. The hospital performed blood work and a urinalysis. Kim declined x-rays or further tests. The cat was diagnosed with periodontal disease and "grade II hematuria." (Some capitalization omitted.)

#### 2. Examination by defendants VCA and Dr. Sung

About two weeks later, on October 17, 2018, at 12:00 noon, Kim took the cat to VCA for a second opinion regarding the cat's urinary-related problems. According to Kim, the cat was walking and not in pain at the time. A veterinary assistant documented the cat's history, complaints, and with Kim's help, weight.

Kim then had a consultation with Dr. Sung regarding the cat. Dr. Sung had been a licensed veterinarian since 2015. Dr. Sung recommended x-rays and other diagnostics. When the cat was placed on the exam table, the cat hissed and swatted. The cat had to be sedated in order for Dr. Sung to conduct a physical examination.

Dr. Sung stated in a declaration that Kim held the cat during their entire discussion.[1] Kim stated in a declaration that the cat "was walking while at the 30 minutes, consult exam," but she did not explain where the cat walked during the examination, how long the

---

[1] The location of the cat at certain points in time is not entirely clear from the record. For example, while Dr. Sung states that Kim held the cat, it is not clear whether the cat was in Kim's arms or in a carrier.

2

cat walked, or whether the veterinary assistant or Dr. Sung saw the cat walking. It is undisputed that, during the consultation, Dr. Sung did not have physical contact with the cat to check the cat's gait.

The cat was in a carrier prior to sedation and examination. Kim waited outside during Dr. Sung's examination of the cat.

VCA's written record of the examination indicates that the cat had a "[n]ormal gait." Dr. Sung later explained in a declaration that the "computer-generated clinic notes inadvertently stated that ambulation/gait were 'normal' " because she "used a pre-filled template that was loaded into the physical examination portion of the clinic notes (which is common to save time in generating records/notes)." (Italics omitted.) Dr. Sung stated that "[t]here was an error in the record because [she] inadvertently forgot to edit the pre-filled text to note the gait could not be checked. Once a note is submitted, it cannot be changed; however, this error was noted/corrected in later notes and/or correspondence and the records do note the cat was held by [Kim] until placed on the examination table." (Italics omitted.)

After the physical examination was performed, VCA had to give additional sedation before x-rays were conducted. In total, the cat "required more than the standard amount of sedation" for its size due to its "fractiousness." During this second dose of a sedative, "Dr. Sung held the cat wrapped in a towel to restrain her in the bottom half of the carrier, while [a registered veterinary technician] administered the second dose of sedative," ketamine. When the registered veterinary technician took the x-rays while the cat was sedated, the registered veterinary technician "may have been assisted by [the veterinary assistant] in repositioning and/or monitoring the cat while under sedation."

Dr. Sung stated in a declaration that "at no point during the care/treatment were we unable to control the cat." Kim stated in a declaration that she was told by a "receptionist . . . that Sung asked [the receptionist] to assist as Sung was not able to maintain control of the exam." Kim did not have any additional information about what the receptionist meant.

By the time the x-rays were completed, Dr. Sung was "scrubbing in" for surgery on another patient. She "glanced cursorily" at one of the x-rays, which was a lateral view, and determined that there were no urinary stones. Dr. Sung, who learned that Kim was waiting outside the clinic for a number of hours rather than waiting at home, quickly informed Kim that there were "no stones" before Dr. Sung went into surgery. In a declaration, Dr. Sung stated that she did not know that the cat had a fractured femur at the time Kim left the clinic with the cat.

The cat was in a carrier upon being returned to Kim. In a declaration, Kim stated that the cat "came out of the carrier pulling a broken leg" and "was no longer able to play, walk, jump or run."

The next day, on October 18, 2018, Dr. Sung received the radiologist's report. After reviewing the report and all the x-rays in detail, Dr. Sung determined that there was "a fracture of the right proximal femur." Dr. Sung immediately tried calling Kim, leaving messages that day and the next day.

Upon reaching Kim on October 20, 2018, Dr. Sung advised that "all views of the x-rays were negative of urinary stones, but the chest was suspicious for asthma and that there was a fracture high on the right hind leg close to the hip." Dr. Sung told Kim that "the radiologist's interpretation was that the fracture had a slightly chronic appearance to it." When Dr. Sung asked Kim if the cat had done anything at home that might have caused a fracture, Kim stated that the cat had been limping for a few days after the visit to the San Jose animal hospital, but that the cat was still walking and appeared to improve. Kim and Dr. Sung discussed surgery and other treatment.

In a declaration, Kim stated that Dr. Sung "was reluctant to explain that Sung was handling [the cat] in a towel." According to Kim, Dr. Sung also told her that the femur injury would heal on its own with no surgery or stabilization. As a result, Kim decided not to have surgery. Kim stated in a declaration that VCA failed to release its x-rays until December 21, 2018.

4

Dr. Sung stated in a declaration that she "strongly recommended a surgical consultation and surgical correction." When Kim asked if the fracture could heal on its own without surgery or with just casting, Dr. Sung advised that it was unlikely or unrealistic and that "surgery was the best course of treatment."

In a declaration, Dr. Sung stated that the location of the fracture was in "one of the strongest bones in the body and significant force or trauma would have to have been exerted or experienced to cause a fracture in a healthy cat at that location." Dr. Sung further stated, "I know of no incident or accident during the course of handling, care and treatment by myself or any of [VCA's] staff members which exerted an improper or excessive amount of force on or trauma to the cat's leg, either intentionally or accidentally which would have fractured a healthy leg."

### 3. Examination by a Santa Clara pet hospital

By late November 2018, the cat was not eating. In early December 2018, Kim took the cat to a Santa Clara pet hospital. The cat was diagnosed with anorexia, dehydration, suspected feline asthma, femoral fracture-chronic, and a history of cystitis. Hospitalization and "aggressive treatment" were recommended. The hospital discussed the "likely poor prognosis without timely aggressive supportive care." Due to "femoral fracture and liver disease," the hospital also raised "the option of humane euthanasia," which Kim declined. Kim wanted a second opinion. The hospital recommended that Kim not wait too long to obtain it and offered to set up an appointment with another doctor or a referral to another hospital. The Santa Clara pet hospital told Kim to "call back with further questions/decision."

### 4. Examination by SAGE Veterinary Centers

Within a day or two, Kim took the cat to SAGE Veterinary Centers (SAGE) to be evaluated for poor appetite. Upon examination, the cat walked with a "noticeable limp on her right hind leg" but the "remainder of [the cat's] exam was normal." Based on prior lab results conducted by another veterinarian indicating "elevated liver values," SAGE

5

performed an "abdominal ultrasound that was negative for any active pancreatitis." SAGE recommended treatment, including repair of the femur fracture, while lab results were pending. SAGE indicated that further testing and treatment might be recommended, such as a liver biopsy. In the meantime, the cat was given fluids and medication. SAGE recommended that the cat be admitted to the hospital for more aggressive testing and treatment if the cat was still not eating well within the next few days.

A few days later, on December 9, 2019, Kim brought the cat back to SAGE. SAGE recommended hospitalization to rehydrate, and Kim agreed to the hospitalization. SAGE also recommended further testing, as well as surgery the next day for the leg fracture.

On December 10, 2018, in the early morning, the cat "was found in [a] cage with no heart beat or respiration" by SAGE.

### 5. Necropsy report

A necropsy was performed by Necropsy Services Group (NSG). The necropsy report, dated December 29, 2018, indicated that the client was SAGE, and that the cat belonged to Kim. The report described the cat as being an eight-year-old "male," "[m]edium [h]air," with a "[t]uxedo" or "black and white hair coat."

According to the necropsy report, the cause of death was "disseminated, metastatic histiocytic sarcoma involving lungs, kidneys, spleen, liver, and bladder." Dr. Sung explained in a declaration that this meant "cancer throughout most of the body."

The necropsy report further stated that the "chronic fracture of the femur was also associated with metastatic infiltration of neoplastic cells indicative of a pathological fracture of weakened bone." Dr. Sung explained in a declaration, "A pathological fracture is a break in a bone which is caused by underlying disease weakening the bone. In short, the bone was clearly weakened by cancer and could have been fractured by any simple, everyday activities, such as walking, running, or jumping. As such, the existence of widespread cancer in the cat, including infiltration into the bone which was fractured, coupled with [Kim's] report that the cat had been limping recently and the chronic appearance of the

6

fracture on x-rays on the date of the cat's examination by [VCA] were consistent with the fracture pre-dating (i.e., already existing on) the date of her initial visit to our clinic, or at a minimum, weakness/pain in that area. Moreover, even if there was no fracture at the time and a fracture occurred at or during the visit, it was not due to negligence or mishandling by me or the [VCA] staff, it would have resulted from regular, standard movement/handling of a medically weakened bone which was undiagnosed at the time."

## B. *The Civil Action*

In the operative second amended complaint, Kim alleged causes of action against defendants for (1) veterinary malpractice, (2) gross negligence, and (3) violation of the UCL.[2] In the veterinary malpractice and gross negligence causes of action, Kim alleged that defendants breached the standard of care by "failing to provide proper handling of [the cat], which resulted in injury and broken bones."

Kim further alleged in the cause of action for gross negligence that defendants failed to disclose and treat the broken femur. She also alleged that Dr. Sung misrepresented that the injury was "able to correct with no stabilization or surgery" and that as a result, Kim "chose not to get surgery." At some point, Dr. Sung also allegedly refused to allow Kim to review the x-rays. Kim allegedly could not afford the estimated $20,000 in treatment.

In the cause of action for violation of the UCL, Kim alleged the "various breaches of duty" constituted unlawful, unfair, and/or fraudulent business practices.

## C. *Defendants' Motion for Summary Judgment*

### 1. Motion by defendants

Defendants filed a motion for summary judgment or, in the alternative, summary adjudication. Defendants contended that Kim could not establish that (1) they failed to meet the standard of care, or (2) any injury or damage was proximately caused by their alleged

---

[2] Kim also alleged other tort claims but defendants successfully demurred to those causes of action. Defendants also successfully moved to strike Kim's claim for punitive damages.

negligence. Defendants argued that the cat had a serious underlying condition that led to the cat's death, and that the death was not "hastened or caused" by the negligence of defendants.

In support of the motion, defendants filed several declarations. Defense counsel stated in the declaration, "Attached . . . to this declaration are true and correct copies . . . of records of [defendant VCA] for . . . the cat, which is the object of the subject litigation, as well as the NSG [n]ecropsy report dated December 29, 2018 on the subject cat which was obtained through discovery in this matter from SAGE."

Defendants also provided a declaration from a veterinarian who had been a board-certified small animal surgeon since 2007. The veterinary surgeon reviewed the records of VCA and SAGE, the necropsy report by NSG, and a declaration by Dr. Sung. He opined that Dr. Sung and VCA "did not deviate from the standard of care for veterinarians or veterinarian facilities in the area in any manner in treating, caring for and diagnosing [the cat] beginning on October 17, 2018." He also opined that "the cat's femoral fracture more likely than not pre-dated the x-rays taken at VCA on October 17, 2018." The veterinary surgeon further opined "that if, in the unlikely case that the fracture did occur on October 17, 2018 at VCA, that it was not due to any deviation from standard of care or professional negligence on the part of Dr. Sung or VCA due to the cat's underlying, undiagnosed metastatic histiocytic sarcoma which weakened the bone to the point that a fracture would have occurred from regular/standard handling and/or day to day activity of the pet." The bases for the veterinary surgeon's opinions included the following:

"Dr. Sung's diagnoses and recommendations were all appropriate and within the standard of care. Her recommendations for the initial diagnostic workup focused on the presenting complaint which was centered on inappropriate urination. [The cat] had actually previously been seen by . . . [a San Jose animal hospital] 2 weeks prior, per the owner, where the treatment for a urinary tract infection had been initiated with bloodwork, urinalysis, and treatment with opioid medications for pain. These treatments had failed, and

[the cat] was presented to Dr. Sung at VCA to continue the diagnostic workup for inappropriate urination. Unfortunately, [the cat] was aggressive on October 17, 2018, and a full physical examination was performed after sedation had been given. The standard of care was met when Dr. Sung performed a complete physical examination, despite the sedation required to complete it, and performed additional diagnostics to include radiographs of the abdomen and an ultrasound guided cystocentesis for a urinalysis.

"At no point was a limp part of the client's concern, nor was it detectable during examination due to patient's fractious behavior which required sedation for a complete examination. Standard of care was exceeded by Dr. Sung when she had the radiographs reviewed by a radiologist who identified a femoral fracture on the radiographs made by Dr. Sung and her staff. Dr. Sung then called repeatedly to make contact with the client and standard of care was again met when she recommended a surgical consult . . . . At all points, Dr. Sung met the standard of care for workup associated with a possible urinary tract (hematuria, stranguria, pollakiuria), and in fact, the clinical signs in which [the cat] presented for were likely as a result of inability to posture and urinate completely secondary to the probable fracture present prior to presentation.

"As to the femur fracture, the records of VCA do not document any fall or other incident while handling, treating and examining the cat which exerted undue force/pressure on the right rear leg which could result in fracture to a healthy femur. In fact, the femur generally requires huge amounts of force to fracture as it had in this particular cat, and the cat would likely be inconsolable in the practice had it happened onsite. It is far more likely that a slow lytic process was at work (which is what cancer in the bone does) where the bone slowly weakens over an accelerated period of time leading to the bone breaking under the weight of the animal's normal weight during normal activity. Pathologic fractures allow the patient to slowly accommodate to the pain from the bone loss and often are ambulatory on those cancerous, broken legs without many obvious signs.

"The cat underwent x-rays and an ultrasound-guided cystocentesis and a good portion of the physical examination while under sedation. The Board-Certified Radiologist . . . interpreted the radiographs . . . and identified a 'Comminuted fracture of the proximal right femur appears slightly chronic in appearance.'

"I have reviewed these radiographs and identified the same fracture noted and feel there is evidence of chronicity at the fracture site, either consistent with a pathologic fracture or one that was present more than 21 days prior. Bone changes of healing or chronic remodeling require more than 3 weeks to become radiographically evident. Chronic changes certainly did not happen during the visit where the radiographs were taken. As such, there is no evidence, nor is it likely, that the femur fracture occurred at VCA on October 17, 2018.

"In veterinary medicine, clinicians often refer to time as a gift. Whereas upon presentation, the story behind what is happening to a particular pet is not fully clear, with a few more days or additional diagnostics, the story becomes crystal clear. It was not until 10 weeks later with the report of Necropsy Support Group (NSG) dated December 29, 2018, that [the cat's] full story became clear. Her necropsy report documented aggressive cancer 'disseminated diffusely' throughout her Lungs, Liver, Kidneys, Spleen, Bladder, and right femur fracture 'assessed at that time as a chronic pathologic fracture.' Given this widespread systemic cancer, it is highly likely that the femur fracture was pathologic and present prior to the presentation at the VCA veterinary practice and that the clinical signs of the bladder infection were actually associated with the tumor being present already in the urinary bladder.

"As such, even in the unlikely event the femur fracture occurred at VCA on October 17, 2018, it was not due to any deviation from standard of care or negligence by Dr. Sung or any VCA staff – rather it was due to the weakened state of the bone due to the undiagnosed sarcoma in which normal activity and handling could cause a fracture.

"Additionally, I do not believe that the cat's eventual death 2+ months after the care rendered at VCA was related in any manner to the care received at VCA or the subject femur fracture. The fracture was simply a symptom of the undiagnosed aggressive cancer the [cat] was suffering from. This cancer was not detectable with the diagnostics performed by VCA on October 17, 2018, nor would standard of care require testing for such at that time. . . . [T]here is no causal link between the cat's death and any of the care, treatment or recommendations by Dr. Sung and/or VCA.

"I believe Dr. Sung and VCA used and exhibited the reasonable skill, diligence, and attention as might ordinarily be expected of careful, skillful and trustworthy veterinarians (i.e., abided by standard of care) and the care provided was within and, in many aspects, actually exceeded the standard of care."

### 2. Opposition by Kim

In opposition, Kim contended that defendants failed to meet their burden on summary judgment and that there were triable issues of fact. She argued that the evidence established that (1) her cat's leg was not broken prior to defendants' October 2018 examination, (2) the examination "was by not the protocol," and (3) "there was no cancer." Kim contended that defendants were "responsible in some manner" for her cat's broken leg. She argued that the declaration from the defense veterinary surgeon "failed to establish the broken leg was not veterinary malpractice." Kim also contended that the finding of cancer in the necropsy report pertained to a male cat with medium hair, and that her cat was female with short hair. Further, according to Kim, the cat's "tests were normal," such as the ultrasonography conducted by SAGE in early December 2018, and there was no cancer. Kim also contended that Dr. Sung failed to disclose the broken femur and failed to treat it before releasing the cat to Kim. She argued that the "treatment was late to spare [the cat] unnecessary pain and suffering." Kim also filed written objections to (1) the declaration of the veterinary surgeon, (2) the necropsy report, and (3) the declaration of Dr. Sung.

11

In a declaration, Kim stated that VCA's records reflected "a failure to evidence that the general anesthesia was in use at 3:25 p.m. to 4:10 p.m."; the records reflected that "ketamine pain management anesthesia was in use at 4:10 p.m. to 4:50 p.m."; "ketamine pain management anesthesia was not the original treatment plan"; Dr. Sung failed "to report the pain reason or assessment"; "Sung's original treatment plan in the morning was to complete 2 x-rays"; there were four x-rays taken; the first x-ray showed the broken femur; the second x-ray was a lateral view that did not show the injury; the third x-ray was "the same picture" as the second x-ray; Kim did not authorize the third and fourth x-rays; and the physical examination, urinalysis, and x-rays were not completed "until 4:30 p.m. to 4:50 p.m."

Kim attached to her declaration various records regarding the cat, as well as Sung's discovery responses. One of the records, dated February 21, 2019 (after the death of the cat), was entitled "Radiographic Interpretation Report" and was purportedly authored by a radiologist who was board certified by the American College of Veterinary Radiology. (Underscoring omitted.) The radiologist apparently prepared the report in response to be being asked the following question, "Is it possible to determine if the femoral fracture is acute at time of October 2018 or if it is a chronic incidental finding?" The radiologist reviewed images of the cat that were apparently taken in October and December 2018. The radiologist ultimately opined that the fracture was "consistent with acute to subacute fracture."

### 3. Reply by defendants

In their reply brief, defendants objected to Kim's evidence. They also argued that she failed to raise a triable issue of material fact, particularly given the absence of any expert testimony contradicting the defense veterinary surgeon. Regarding the necropsy report's reference to a male cat with medium hair, defendants contended the report contained a "typographical or transcription error." They argued that "all identifying

12

information is for the subject cat and the physical findings of the subject fracture are consistent with the fracture reported in [Kim's] cat."

### 4. Hearings and orders

At the initial hearing on defendants' summary judgment motion,[3] the trial court heard argument and then took the matter under submission. In a June 2024 written order, the court explained that the motion was based on the defense veterinary surgeon's expert opinion, which in turn was based in significant part on the cancer diagnosis in the necropsy report. The court determined that the necropsy report was hearsay and had "not been authenticated by a custodian of records as a business record." (Fn. omitted.) The court observed that defendants at the hearing on the summary judgment motion had requested leave to authenticate the necropsy report and to "otherwise correct the missing evidence from the record." The court in its written order granted the request. The court ordered defendants to "file additional evidence (no argument), including authentication for third party records and documents their expert relied on . . . ." Kim was given the opportunity to "respond by filing . . . any responsive evidence." The court set the matter for a further hearing.

Defendants thereafter filed supplemental declarations, including from their veterinary surgeon, who attached as exhibits the specific documents that he relied on in reaching his opinions. Defendants also filed a declaration from the custodian of records for SAGE. Further, Dr. Sung filed a supplemental declaration authenticating the VCA records.

Defendants also filed a declaration from the veterinary pathologist who conducted the necropsy and wrote the necropsy report. The veterinary pathologist authenticated a copy of the necropsy report. He also stated that the necropsy report pertained to the "cat owned by . . . Kim which was found dead in its cage at SAGE Veterinary Center . . . on or about December 10, 2018 . . . ." The veterinary pathologist stated that the report "accurately reflect[ed his] observations, assessments and opinions as to the condition of the cat and

---

[3] The record on appeal does not contain a record of the oral proceedings.

13

evidence of any illnesses or conditions observed in the cat at the time of the necropsy." The veterinary pathologist further stated, "The identification of the cat as a 'male' is not necessarily definitive in this case, as that information was most likely either simply transferred from the paperwork identifying the cat, or might have been mistakenly transcribed from that paperwork by me, as there was no microscopic examination of reproductive tract of the cat to determine its sex, nor were there any obvious sex organs found during the necropsy which would specifically and accurately identify the sex of the cat."

Kim filed opposition contending that defendants were not entitled to summary judgment.

A further hearing was held on defendants' summary judgment motion.[4] After hearing argument, the trial court granted the motion. In a July 9, 2024 written order, the court declined to rule on Kim's and defendants' evidentiary objections because neither set of objections complied with the California Rules of Court. The court determined that the supplemental declarations provided by defendants were sufficient to authenticate the relevant medical and other records. The court further determined that the defense veterinary surgeon's declaration, along with the documents that he relied on, including the necropsy report, satisfied defendants' burden to show that there was no triable issue regarding the standard of care with respect to the veterinary malpractice and gross negligence claims. The court found Kim's evidence insufficient to meet her burden to create a triable issue, particularly given "her failure to provide any conflicting expert testimony." Regarding the unfair competition claim, the court found that Kim failed to address the claim in her opposition, the claim was based on the negligence claims, and that Kim did not provide any evidence that could support the unfair competition claim.

On August 2, 2024, a judgment was filed in favor of defendants.

---

[4] The record on appeal does not contain a record of the oral proceedings.

14

**D. *Kim's Motion for New Trial***

In the meantime, on July 30, 2024, Kim filed a motion for new trial. She contended that the trial court erred in granting summary judgment in favor of defendants. On August 14, 2024, defendants filed opposition. Kim thereafter filed a reply brief. After a hearing, by written order filed September 5, 2024, the trial court denied the motion.

Kim filed a timely notice of appeal on September 26, 2024, referring to the judgment and the order denying a new trial.

## II. DISCUSSION

On appeal, Kim contends that the trial court erred in granting defendants' summary judgment motion and in denying her motion for new trial. Defendants argue that Kim has not appealed from an appealable order, and that the trial court did not err in either ruling.

We first address the issue of appealability, before turning to the parties' failure to comply with the California Rules of Court requiring adequate citations to the record. We then analyze the substance of Kim's appeal.

**A. *Appealability***

Defendants contend that Kim has improperly attempted to appeal from the order denying a new trial. We determine that we have jurisdiction over this appeal and that we may reach the merits of Kim's appeal. "An order denying a motion for new trial is nonappealable. [Citation.] Such an order, however, may be reviewed on appeal from the underlying judgment. [Citations.]" (*Walker v. Los Angeles County Metropolitan Transportation Authority* (2005) 35 Cal.4th 15, 18 (*Walker*).)

In this case, defendants acknowledge that a judgment was filed in August 2024. Kim's notice of appeal refers to the August 2024 judgment and the September 2024 order denying a new trial. As Kim has properly appealed from the judgment in this case, we may review both the order granting summary judgment and the order denying a new trial. (See *Walker*, *supra*, 35 Cal.4th at p. 18.)

**B. *Burden on Appeal and Adequate Record Citations***

On appeal, "the burden is on an appellant to demonstrate . . . that the trial court committed an error that justifies reversal of the judgment." (*Jameson v. Desta* (2018) 5 Cal.5th 594, 609 (*Jameson*).) Both the appellant and the respondent must support each point in their appellate briefs with argument and, if possible, citation to legal authority. (Cal. Rules of Court, rule 8.204(a)(1)(B).)[5] "[I]t is not an appellate court's job to develop arguments for the parties." (*Jefferson Street Ventures, LLC v. City of Indio* (2015) 236 Cal.App.4th 1175, 1196, fn. 2.) Further, adequate record citations "must" be provided, which requires each party in their briefs to "[s]upport any reference to a matter in the record by a citation to the volume and page number of the record where the matter appears." (Rule 8.204(a)(1)(C).) This requirement of specific record citations also applies to records that are in electronic form. (*Ibid.*) If a party fails to provide "reasoned legal analysis" of a point, or " 'exact page citations' " to the record, the party's contention may be deemed to have been forfeited. (*Jefferson Street Ventures, LLC*, *supra*, at p. 1196, fn. 2; *Duarte v. Chino Community Hospital* (1999) 72 Cal.App.4th 849, 856.)[6]

**C. *Summary Judgment***

**1. Standard of review for an order granting summary judgment**

A defendant moving for summary judgment or summary adjudication has the initial burden of showing that an element of a cause of action cannot be established. (Code Civ. Proc., § 437c, subds. (f)(1), (*o*)(1) & (p)(2);[7] *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 (*Aguilar*).) If the defendant makes a prima facie showing that justifies a

---

[5] All further rule references are to the California Rules of Court.

[6] In this case, neither Kim nor defendants provided *any* record citations for their statement of facts in their opening or responding brief. Further, Kim's recitation of the procedural history contains no record citations, while defendants provide citations for some, but not all, of their procedural history. The parties are admonished to provide record citations in the future for all references to a matter in the record.

[7] All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

judgment in the defendant's favor, the burden shifts to the plaintiff to make a prima facie showing of the existence of a triable issue of material fact. (§ 437c, subd. (p)(2); *Aguilar, supra*, at pp. 850, 849.)

"A party cannot avoid summary judgment by asserting facts based on mere speculation and conjecture, but instead must produce admissible evidence raising a triable issue of fact. [Citation.]" (*LaChapelle v. Toyota Motor Credit Corp.* (2002) 102 Cal.App.4th 977, 981.) "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar, supra*, 25 Cal.4th at p. 850, fn. omitted.)

" 'On review of an order granting . . . summary judgment, we examine the facts presented to the trial court and determine their effect as a matter of law.' [Citation.] . . . Evidence presented in opposition to summary judgment is liberally construed, with any doubts about the evidence resolved in favor of the party opposing the motion. [Citation.]" (*Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607, 618 (*Regents*).) "The trial court's stated reasons for granting summary judgment are not binding on us, because we review the court's ruling, not its rationale. [Citations.]" (*Maksimow v. City of South Lake Tahoe* (2024) 106 Cal.App.5th 514, 522.)

### 2. Filing of additional evidence by defendants

We understand Kim to contend that the trial court erred in its initial June 2024 order by allowing defendants an opportunity to file additional evidence to authenticate the medical records. We are not persuaded by Kim's argument.

While the summary judgment motion was pending in this case, and through the time the trial court filed its final order denying the motion, a trial court had "discretion to consider new evidence in reply papers supporting a summary judgment motion as long as the opposing party ha[d] notice and an opportunity to respond. [Citation.] Evidence which is used to fill gaps in the original evidence created by the opposition is particularly

17

appropriate to consider in a reply. [Citation.]" (*Los Angeles Unified School Dist. v. Torres Construction Corp.* (2020) 57 Cal.App.5th 480, 499 (*Los Angeles Unified School Dist.*).).)[8]

In view of a trial court's discretion to consider new evidence in reply papers, we believe the court in this case also had the discretion to consider new evidence after the reply papers were filed, so long as Kim was given notice and an opportunity to respond. Kim was given notice through the court's June 2024 order, she was given an opportunity to respond to the additional evidence, and she in fact did respond to the additional evidence. Indeed, the record does not reflect that Kim objected to the trial court giving defendants the opportunity to file additional evidence authenticating the medical records.

Moreover, the supplemental evidence filed by defendants simply "fill[ed] the gaps in the original evidence." (*Los Angeles Unified School Dist.*, *supra*, 57 Cal.App.5th at p. 499.) The trial court determined that the medical records had not been adequately authenticated in defendants' moving papers. The supplemental declarations filed by defendants "fill[ed]" this "gap[]." (*Ibid.*; see *Professional Engineers in California Government v. Brown* (2014) 229 Cal.App.4th 861, 875 [determining there was no abuse of discretion to admit supplemental declaration, (1) which remedied original declaration that was lacking foundation and conclusory, and (2) which "raised no new theories and arguments"].) We find no abuse of discretion by the trial court.

### 3. Specification of reasons in the summary judgment order

Kim contends that the "trial court must consider all of the evidence in the papers," and that the trial "court failed to specify the issues completely or the conflicting evidence for each triable issue that would preclude summary judgment." Kim contends that this

---

[8] Effective January 1, 2025, after the judgment was filed in the instant case, the summary judgment statute was amended to state, "The reply shall not include any new evidentiary matter, additional material facts, or separate statement submitted with the reply and not presented in the moving papers or opposing papers." (§ 437c., subd. (b)(4), as amended by Stats. 2024, ch. 99, § 1.)

precludes an appellate court from conducting a meaningful review of the issues. We determine that Kim fails to demonstrate reversible error.

Section 437c, subdivision (g) provides that if summary judgment is *denied* based on the existence of a triable issue, the trial court "shall . . . specify one or more material facts raised by the motion that the court has determined there exists a triable controversy. This determination shall specifically refer to the evidence proffered in support of and in opposition to the motion that indicates that a triable controversy exists."

On the other hand, if, as in this case, summary judgment is *granted* based on the absence of a triable issue, "the court shall . . . specify the reasons for its determination. The order shall specifically refer to the evidence proffered in support of and, if applicable, in opposition to the motion that indicates no triable issue exists." (§ 437c, subd. (g).) "A statement of reasons is sufficient if it allows for meaningful appellate review. [Citation.]" (*Santa Barbara Pistachio Ranch v. Chowchilla Water Dist.* (2001) 88 Cal.App.4th 439, 448 (*Santa Barbara Pistachio Ranch*).)

In this case, the trial court's July 2024 order granting summary judgment specified "the reasons for its determination" and "specifically refer[red] to the evidence proffered in support of and . . . in opposition to the motion that indicate[d] no triable issue exists." (§ 437c, subd. (g).) The court's order explained that the defense veterinary surgeon's declaration, along with the documents that he relied on, including the necropsy report, satisfied defendants' burden to show that there was no triable issue regarding the standard of care with respect to the veterinary malpractice and gross negligence claims. The court also quoted from the veterinary surgeon's declaration. Further, the court explained why Kim's evidence was insufficient to meet her burden to create a triable issue by specifically identifying "her failure to provide any conflicting expert testimony." Regarding the unfair competition claim, the court determined that Kim failed to respond to this claim, that it was based on the negligence claims, and that she failed to provide any evidence that could support the unfair competition claim. We determine that the court's written order in this

case was "sufficient" to "allow[] for meaningful appellate review," in contrast to *Santa Barbara Pistachio Ranch*, where there were "no oral or written statement of reasons from the court in [the appellate] record." (*Santa Barbara Pistachio Ranch*, *supra*, 88 Cal.App.4th at pp. 448, 449.)

Moreover, even if the trial court's written order was insufficient, the "failure to provide a sufficient statement of reasons is not automatic grounds for reversal, since ' "[i]t is the validity of the ruling which is reviewable and not the reasons therefor. [Citation.]" ' [Citations.] 'The lack of a statement of reasons presents no harm where . . . our independent review establishes the validity of the judgment.' [Citations.]" (*Santa Barbara Pistachio Ranch*, *supra*, 88 Cal.App.4th at pp. 448-449.) In this case, Kim fails to demonstrate that reversal is warranted based on the trial court's purported failure to comply with section 437c, subdivision (g).

### 4. Veterinary malpractice and gross negligence causes of action

In her causes of action for veterinary malpractice and gross negligence, Kim alleged that defendants breached the standard of care and that she suffered damages as a result. On appeal, we understand Kim to contend that defendants did not meet their initial burden on summary judgment and that triable issues of material fact exist.

#### a. *general legal principles*

Regarding gross negligence, "California does not recognize a distinct common law cause of action for gross negligence apart from negligence. [Citations.]" (*Jimenez v. 24 Hour Fitness USA, Inc.* (2015) 237 Cal.App.4th 546, 552, fn. 3; see *Joshi v. Fitness Internat., LLC* (2022) 80 Cal.App.5th 814, 825 [explaining that "[g]ross negligence is a subspecies of negligence; it is not a separate tort"].) The elements of a negligence claim are "duty, breach, causation, and damages. [Citation.]" (*Regents*, *supra*, 4 Cal.5th at p. 618.)

Regarding veterinary malpractice, the applicable standard of care for veterinarians is the same as for medical doctors. (*Williamson v. Prida* (1999) 75 Cal.App.4th 1417, 1424-1425.) The plaintiff must establish: " ' " '(1) the duty of the professional to use such skill,

prudence, and diligence as other members of his profession commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal connection between the negligent conduct and the resulting injury; and (4) actual loss or damage resulting from the professional's negligence.' " ' [Citations.]" (*Borrayo v. Avery* (2016) 2 Cal.App.5th 304, 310 (*Borrayo*).)

"Opinion testimony from a properly qualified witness is generally necessary to demonstrate the elements for medical malpractice claims. [Citations.]" (*Borrayo*, *supra*, 2 Cal.App.5th at p. 310.) For example, regarding the first element of a malpractice claim, "to establish what that degree of skill, knowledge and care is, there must be expert testimony explaining how the average veterinarian of ordinary skill and knowledge from the relevant community would have treated the case under similar circumstances." (*Quigley v. McClellan* (2013) 214 Cal.App.4th 1276, 1285.) "When a defendant health care practitioner moves for summary judgment and supports his motion with an expert declaration that his conduct met the community standard of care, the defendant is entitled to summary judgment unless the plaintiff comes forward with conflicting expert evidence. [Citation.]" (*Borrayo*, *supra*, at p. 310.)

### b. *analysis*

In this case, defendants moved for summary judgment on the negligence claims (veterinary malpractice and gross negligence) on the grounds that they acted within the standard of care and that they did not cause any damages. In support of the motion, defendants provided a declaration from a veterinary surgeon who reviewed various records regarding the cat, including the necropsy report, and a declaration by Dr. Sung. The veterinary surgeon opined that (1) Dr. Sung and VCA "did not deviate from the standard of care . . . in treating, caring for and diagnosing [the cat] beginning on October 17, 2018"; (2) "the cat's femoral fracture more likely than not pre-dated the x-rays taken at VCA on October 17, 2018"; and (3) "if, in the unlikely case that the fracture did occur . . . at VCA, . . . it was not due to any deviation from standard of care or professional negligence on the part of Dr. Sung or VCA due to the cat's underlying, undiagnosed metastatic

histiocytic sarcoma which weakened the bone to the point that a fracture would have occurred from regular/standard handling and/or day to day activity of the pet." The veterinary surgeon detailed his reasons for these opinions, including by referring to the specific treatment provided by Dr. Sung and VCA. Based on this declaration and other evidence submitted by defendants, the trial court did not err in determining that defendants met their initial burden on summary judgment. (See *Lattimore v. Dickey* (2015) 239 Cal.App.4th 959, 969 (*Lattimore*) [declaration by medical expert regarding records reviewed, brief summary of patient's treatment, and opinion that standard of care was met, was sufficient to meet moving party's initial burden].)

On appeal, we understand Kim to contend that defendants failed to meet their initial burden of showing that they acted within the standard of care during the exam and that they were not "responsible" for her cat's broken leg. Kim contends that as a result, the burden never shifted to her to provide an expert declaration to rebut the defense expert's declaration.

First, Kim argues that the trial court erred by relying on the declaration by the defense's veterinary surgeon, who in turn relied in part on the necropsy report's finding of cancer. Kim cites *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, which held that a "trial court has the duty to act as a 'gatekeeper' to exclude speculative expert testimony." (*Id.* at p. 753.)

More specifically, Kim contends that defendants' October 17, 2018 x-rays of the cat were "normal," and that SAGE's December 6, 2018 "ultrasonography" on the cat showed "normal" results. We understand Kim to argue that these test results show the cat was normal and that the cat's subsequent death was not caused by cancer, that is, "disseminated, metastatic histiocytic sarcoma involving lungs, kidneys, spleen, liver, and bladder" as found in the necropsy report, and as relied on by the defense expert in forming his opinions that the defendants did not breach the standard of care. However, nothing in the record, such as an expert declaration for example, indicates that the testing performed by defendants or

22

SAGE was capable of detecting the condition identified in the necropsy report, or that the test results obtained by defendants or SAGE established that the cat could not have had the condition identified in the necropsy report. In the absence of such evidence, Kim fails to establish the materiality of defendants' or SAGE's test results showing that the cat was purportedly normal.[9]

Second, Kim argues that her cat had a normal gait until after the cat left defendants' care, which shows defendants negligently caused the cat's fracture. To the extent Kim relies on defendants' written report reflecting that the cat had a "[n]ormal gait" at the October 2018 examination, the unrebutted evidence established that this notation was an inadvertent computer error by Dr. Sung and that she did not examine the cat's gait. Further, the unrebutted opinion of the defense expert was that "the femur generally requires huge amounts of force to fracture as it had in this particular cat, and the cat would likely be inconsolable in the practice had it happened onsite. It is far more likely that a slow lytic process was at work (which is what cancer in the bone does) where the bone slowly weakens over an accelerated period of time leading to the bone breaking under the weight of the animal's normal weight during normal activity. Pathologic fractures allow the patient to slowly accommodate to the pain from the bone loss and often are ambulatory on those cancerous, broken legs without many obvious signs." The defense expert further opined that "[g]iven this widespread systemic cancer, it is highly likely that the femur fracture was pathologic and present prior to the presentation at the VCA veterinary practice," but that "even in the unlikely event the femur fracture occurred at VCA on October 17, 2018, it was not due to any deviation from standard of care or negligence by Dr. Sung or any VCA staff – rather it was due to the weakened state of the one due to the undiagnosed sarcoma in which normal activity and handling could cause a fracture."

---

[9] We note that the undisputed evidence, based on the declaration by the defense expert, was that the cat's "cancer was not detectable with the diagnostics performed by VCA on October 17, 2018, nor would standard of care require testing for such at that time."

Third, we understand Kim to contend that the necropsy report, which the defense veterinary surgeon relied on, was not "admissible" evidence because it referred to a medium-haired male cat, whereas her cat was a short-haired female. Kim also generally refers to the "chain of custody." We understand Kim to further contend that NSG's invoice for the necropsy was dated December 7, 2018, but her cat did not pass away until December 10, 2018. In making these arguments, we understand Kim to contend that her cat was not the cat with cancer described in the necropsy report.

We are not persuaded by Kim's argument that the necropsy report was inadmissible on these grounds or that the defense expert could not properly rely on the necropsy report. Regarding the cat's hair length, Kim does not provide any explanation, let alone evidence, demonstrating the significance in the description of a short-haired cat as compared to a medium-haired cat. For example, it is not clear whether there is overlap between the categories or whether the distinction between the two categories would be apparent or determinable without controversy.

Regarding the reference in the necropsy report to a male cat, the veterinary pathologist who performed the necropsy stated in a declaration that this identification was "not necessarily definitive" because he did not conduct a "microscopic examination of reproductive tract of the cat to determine its sex, nor were there any obvious sex organs found during the necropsy." The veterinary pathologist explained that the information "most likely either simply transferred from the paperwork identifying the cat, or might have been mistakenly transcribed from that paperwork by" the veterinary pathologist.

Further, the defense veterinary surgeon who provided an expert opinion in this case could reasonably rely on the necropsy report, despite the discrepancy in the sex of the cat, in view of several other specifics in the report that linked the report to Kim's cat. For example, the necropsy report referred to other distinctive physical characteristics, such as the cat's "[t]uxedo coloring," weight, and proximal right femur fracture, as well as the date of the cat's death, all of which were consistent with the cat's medical records.

24

Regarding the invoice containing a date discrepancy, Kim does not provide a record citation showing that the invoice was provided to the trial court in connection with the summary judgment motion. Although Kim provided a purported copy of the invoice with her motion for a new trial, it was not properly authenticated and she otherwise failed to establish its admissibility. Further, information in the invoice, including the necropsy report number, linked the invoice to the necropsy report for Kim's cat. In turn, the necropsy report with the same report number indicated that the cat passed away on December 10, 2018, and the report itself is dated December 29, 2018. The invoice on its face indicated that the recipient received it a few days later, on January 2, 2019.

Fourth, Kim contends that some of the statements in Dr. Sung's declaration were "[n]ot [a]dmissible." Kim fails to persuasively articulate why any particular statement was not admissible. Further, to the extent she disputes certain statements by Dr. Sung, Kim fails to demonstrate that the dispute was material to the issues raised by defendants' summary judgment motion.

Fifth, Kim argues that "SAGE is Not Admissible" and makes several factual assertions about the cat's purported care while in SAGE's custody. Kim does not provide citations to the record for any of these factual assertions. She also does not persuasively articulate the relevance of these factual assertions with respect to her negligence and veterinary malpractice claims against defendants VCA and Dr. Sung.

Sixth, Kim contends that "SAGE failed to establish the evidence by Hearsay Exception Evidence Code 1271" and cites to the trial court order determining that defendants properly authenticated SAGE's records through a declaration by the custodian of records for SAGE. Kim fails to persuasively articulate why the trial court's finding was erroneous.

Seventh, we understand Kim to contend that defendant VCA's records concerning, for example, the number, sequence, and timing of x-rays, anesthesia, and completion of all the testing, demonstrate veterinary malpractice and gross negligence. To the extent Kim

provides citations to the record on appeal to support her factual assertions, she does not persuasively articulate how these facts show that defendants failed to meet their initial burden.

We determine that defendants' evidence, which included a declaration from a veterinary surgeon that defendants acted within the standard of care and that the cat's injury was not caused by any professional negligence by defendants, was sufficient to meet their initial burden on summary judgment. (See *Lattimore*, *supra*, 239 Cal.App.4th at p. 969.) Plaintiff fails to demonstrate that defendants' evidence was inadequate to meet their initial burden.

On appeal, in addition to contending that defendants failed to meet their initial burden, we understand Kim to also contend that there was a triable issue of material fact regarding whether defendants "failed to provide proper handling with the exam" and were "responsible" for her cat's broken leg.

For example, Kim relies on a radiologist's interpretation, which she obtained after the cat's death, of October and December 2018 x-ray images to contend that her cat's fracture was acute. However, it is not clear whether the radiologist specifically looked for cancer, and whether the radiologist was able to affirmatively rule out cancer from his review of the images. Without a qualified medical expert contradicting the bases set forth in the declaration by the defense's veterinary surgeon, Kim fails to create a triable issue regarding the matters set forth in the defense expert's declaration.

Next, Kim cites websites that purportedly discuss how a veterinarian may detect a fracture during a physical examination of a pet. Kim fails to persuasively articulate why the websites create a triable issue of material fact in this case.

Further, we understand Kim to argue that the doctrine of res ipsa loquitur applied in this case, such that there was a presumption that defendants' negligence caused the cat's broken leg. Kim refers to evidence that the cat did not appear to have a broken leg prior to defendants' examination but that she was "pulling a broken leg" after the visit.

The doctrine of res ipsa loquitur is "applicable to certain kinds of accidents that are so likely to have been caused by a defendant's negligence that, in the Latin equivalent, ' "the thing speaks for itself." ' [Citation.]" (*Baumgardner v. Yusuf* (2006) 144 Cal.App.4th 1381, 1389.) The doctrine "is a presumption affecting the burden of producing evidence." (Evid. Code, § 646, subd. (b).) If the presumption applies, an inference arises that "a proximate cause of the occurrence was some negligent conduct on the part of the defendant." (*Id.*, subd. (c)(1).)

As we have explained above, however, "[w]hen a defendant health care practitioner moves for summary judgment and supports his motion with an expert declaration that his conduct met the community standard of care, the defendant is entitled to summary judgment unless the plaintiff comes forward with conflicting expert evidence. [Citation.]" (*Borrayo*, *supra*, 2 Cal.App.5th at p. 310.) An exception to the requirement of conflicting expert evidence is when " ' " the conduct required by the particular circumstances is within the common knowledge of the layman." [Citations.]' [Citation.]" (*Munro v. Regents of University of California* (1989) 215 Cal.App.3d 977, 984; see *ibid*. [determining that the "circumstances under which genetic testing for Tay-Sachs disease is indicated, are beyond a layman's knowledge"].) "The 'common knowledge' exception is principally limited to situations in which the plaintiff can invoke the doctrine of res ipsa loquitur, i.e., when a layperson 'is able to say as a matter of common knowledge and observation that the consequences of professional treatment were not such as ordinarily would have followed if due care had been exercised.' [Citations.] The classic example, of course, is the X-ray revealing a scalpel left in the patient's body following surgery. [Citation.]" (*Flowers v. Torrance Memorial Hospital Medical Center* (1994) 8 Cal.4th 992, 1001, fn. omitted.)

In this case, whether the cat's fracture was due to cancer, as reflected in the expert evidence, or whether some other cause was a substantial factor, such as professional malpractice by defendants, is not a matter of common knowledge and observation of a

layperson. Kim was required to provide an expert declaration contradicting the defense's veterinary surgeon in order to raise a triable issue in this case.

We also understand Kim to contend that defendants delayed the release of the x-rays. However, she does not provide a citation to the record reflecting evidence of whether or when she requested the x-rays from VCA. Kim thus fails to demonstrate a triable issue regarding whether defendants delayed in releasing the x-rays.

Lastly, Kim contends on appeal, and likewise stated in a declaration in opposition to the summary judgment motion, that Dr. Sung told her "the broken femur injury would heal on its own with no surgery or stabilization" and as a result, Kim "chose not to get surgery." However, notwithstanding this discussion about whether the injury would heal on its own, Dr. Sung stated in a declaration that she "strongly recommended a surgical consultation and surgical correction" and "advised [Kim] that surgery was the best course of treatment." Kim in her declaration in opposition to the summary judgment motion did not dispute or otherwise address the fact that Dr. Sung recommended a surgical consult and correction. Kim thus fails to demonstrate a triable issue regarding whether Dr. Sung's advice fell below the standard of care. However, even if Kim's declaration could be liberally construed as suggesting that Dr. Sung, although raising surgical correction, did not sufficiently urge that option to Kim, we determine that this evidence would not create a triable issue of material fact given the cat's widespread and aggressive metastatic cancer.

Therefore, we determine that the trial court did not err in granting summary adjudication of Kim's causes of action for veterinary malpractice and gross negligence.

### 5. Unfair competition cause of action

Kim's unfair competition claim was based on the same allegations underlying her gross negligence and veterinary malpractice claims. In her opposition to defendants' summary judgment motion, she did not provide a specific argument regarding the unfair competition claim. On appeal, Kim makes factual assertions regarding this cause of action

without any citation to the record on appeal. Further, the only legal authority she cites is Evidence Code section 646 regarding res ipsa loquitur.

"The UCL defines 'unfair competition' as 'any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising.' (Bus. & Prof. Code, § 17200.) By proscribing 'any unlawful' business act or practice [citation], the UCL ' "borrows" ' rules set out in other laws and makes violations of those rules independently actionable. [Citation.] However, a practice may violate the UCL even if it is not prohibited by another statute. Unfair and fraudulent practices are alternate grounds for relief. [Citation.]" (*Zhang v. Superior Court* (2013) 57 Cal.4th 364, 370.)

In this case, Kim fails to articulate, with relevant supporting legal authority, why the evidence in this case, with supporting record citations, creates a triable issue regarding an unlawful, unfair, or fraudulent business act or practice by defendants. Kim's argument on appeal regarding this cause of action is "too undeveloped and unsupported to be persuasive [Citation.]" (*Meridian Financial Services, Inc. v. Phan* (2021) 67 Cal.App.5th 657, 699; accord, *Los Angeles Unified School Dist. v. Torres Construction Corp.* (2020) 57 Cal.App.5th 480, 497-498.)

Accordingly, we determine that the trial court did not err in granting summary judgment of Kim's veterinary malpractice, gross negligence, and unfair competition claims.

**D.** *New Trial Motion*

We understand Kim to contend that defendants failed to timely file their opposition to her motion for new trial. We determine that Kim fails to demonstrate reversible error.

A party may bring a motion for new trial after an order granting summary judgment. (*Aguilar*, *supra*, 25 Cal.4th at p. 858.) Any opposition must be filed within 10 days after service of the moving brief and accompanying documents. (§ 659a; rule 3.1600(a).) A trial

29

court may extend the deadline for an additional 10 days upon a showing of good cause. (§ 659a.)

In this case, the record reflects that on July 30, 2024, Kim filed and served by mail documents supporting the new trial motion. Defendants filed their opposition 15 days later, on August 14, 2024. The record does not reflect that defendants sought an extension of the 10-day deadline from the trial court. In this court, defendants contend that their opposition was timely filed based on section 1013, which generally extends any prescribed time period by five calendar days after service by mail. (See *id.*, subd. (a).) Kim in her reply brief on appeal does not dispute defendants' contention that section 1013 applied in this case to extend the time for them to file opposition to her new trial motion.

We determine that, even if section 1013 does not extend the time in this context, Kim nevertheless fails to meet her burden on appeal to show error. (See *Jameson*, *supra*, 5 Cal.5th at p. 609 [explaining that the appellant has the burden to show reversible error].) "[S]ection 659a does not deprive a court of fundamental jurisdiction to consider [documents] submitted after the . . . deadline set forth in the statute." (*Kabran v. Sharp Memorial Hospital* (2017) 2 Cal.5th 330, 334.) Moreover, because the record on appeal does not reflect that Kim "object[ed] to the timeliness of the [opposition] in the trial court, [she] may not raise this issue for the first time on appeal." (*Ibid.*)

### III.   DISPOSITION

The judgment is affirmed.

_____
Greenwood, P. J.

WE CONCUR:



_____
Danner, J.




_____
Lie, J.



H052605 Kim v. Pets' Rx, Inc., et al.